THE FIREMAN'S INSURANCE COMPANY *v.*
Wanda SMITH and Betty WADE, et al.

CA 84-135                                    683 S.W.2d 234

Court of Appeals of Arkansas
En Banc
Opinion delivered January 23, 1985
[Rehearing denied February 20, 1985.*]

*COOPER and MAYFIELD, JJ., would grant rehearing.

*Rieves & Mayton,* by: *Connie Lewis Mayton,* for appellant.

*Fletcher C. Lewis* and *Jim O'Hare,* for appellee.

GEORGE K. CRACRAFT, Chief Judge. The Fireman's Insurance Company appeals from a declaratory judgment from the Circuit Court of Woodruff County that its home-owner's insurance policy issued to Dudley C. Roane afforded coverage for liability and a duty to defend an action for the wrongful death of Herschel Wane Smith brought by his administratrixes against the insured's estate, and that coverage was not precluded under a policy which excluded from coverage "bodily injury which is expected or intended by the insured" and placed a duty upon the insured to give written notice of an accident or occurrence "as soon as practicable." Appellant contends that the trial court erred in failing to direct a verdict and refusing to grant judgment notwithstanding the verdict on both points. Our conclusion

that there was error in the first point makes it unnecessary for us to address the second one.

On March 4, 1982 Dudley C. Roane shot and killed Herschel Wane Smith in or beside a truck parked outside a tavern near Fair Oaks in Cross County. On March 26, 1982 Wanda Smith and Betty Wade as co-administratrixes of Smith's estate, brought a wrongful death action against Roane alleging that the killing was *"willful, malicious and intentional."* Roane employed his own counsel to represent him in that action and the insurance carrier was given no notice of either the event or the filing of the suit. On April 12, 1983 the appellant was notified of the killing and complaint for the first time in a letter from Roane's counsel in a wrongful death action, saying that he understood that Roane had had a homeowner's policy and asking that the complaint be evaluated by the appellant since the attorney did not know what the terms of the policy were.

Roane committed suicide on May 24, 1983 and the action was thereafter revived in the name of his estate. Appellant upon receipt of the copy of the complaint employed local counsel to defend the suit on reservation of its right to deny coverage either for failure of the insured to give notice of the event and complaint "as soon as practicable" as provided by the policy, or under a policy provision excluding coverage for bodily injury which is "expected or intended by the insured." On July 12, 1983 the appellee amended the complaint to include an alternative plea that the killing resulted from Roane's "ordinary negligence." On April 12 appellant filed this action for a declaration of its obligations under both policy provisions.

Both at the close of the plaintiff's case and after all the evidence was in, the appellant's motion for a directed verdict was overruled. The matter was submitted to a jury on written interrogatories. The jury found that Roane did not intend to shoot Smith or intend or expect the result and that appellant was not prejudiced by notice of the occurrence not being given as soon as practicable. The court thereafter overruled appellant's motion for judgment notwithstanding the verdict. This appeal followed.

The interpretation and application of an exception in an insurance policy which excludes coverage for personal injury which is "expected or intended" by the insured has been settled by this court in *Talley* v. *MFA Mutual Ins. Co.*, 273 Ark. 269, 620 S.W.2d 260 (1981) and *CNA Ins. Co.* v. *McGinnis*, 282 Ark. 90, 666 S.W.2d 689 (1984). In *Talley* the insured admitted firing the shotgun blast which severely injured two persons but denied that he knew they were in his line of fire or that he intended to cause them or anyone else an injury. There was evidence corroborating that testimony. The court held that if the insured intended to shoot the injured party there was no coverage, but if he did not and the injury was the result of mere negligence on his part, there was coverage.

In *CNA Ins. Co.* suit was brought against the insured for sexually abusing a small child over a period of years, the abuse having allegedly resulted in multiple injuries to her. There the insured admitted the conduct with which he was charged but denied that he intended any harm from his activities. There was evidence from a psychologist that males involved in similar activities do not intend or expect that the young females will sustain any injury. The trial court found that the insurer had failed in its burden of proving that although the act was intentional the result was expected. The Court of Appeals affirmed the trial court. *CNA Ins. Co.* v. *McGinnis*, 10 Ark. App. 234, 663 S.W.2d 182 (1984). On review the Supreme Court reversed, agreeing with the dissent in the Court of Appeals that for a stepfather in such a situation to claim that he did not expect or intend to cause injury "flies in the face of all reason, common sense and experience." It cited with approval *Clark* v. *Allstate Ins. Co.*, 22 Ariz. App. 601, 529 P.2d 1195 (1975) where there was a similar disclaimer of intent to do harm when one person struck another in the face causing serious injury. The Arizona court held that such an action is one which is recognized as one so certain to cause a particular kind of harm that we can say a person who performed the act intended the resulting harm. *CNA Ins. Co.* concluded that the language in an insurance policy such as this is to be construed in its plain, ordinary and popular sense and means that there is an exclusion from coverage for injuries

which the average run of reasonable people would expect or intend to inflict by engaging in the conduct in question.

Under our rules of appellate review we will not reverse a jury's verdict unless we find it to be unsupported by substantial evidence. From our review of the testimony in this case we conclude that the jury's finding that Roane did not intend to shoot Smith and did not intend to inflict injury on him is not supported by substantial evidence.

Several witnesses established that Roane was a stranger to them who had arrived at the tavern around 10:00 p.m. on the evening of the killing. He bought a round of drinks for everyone in the tavern and was invited to join certain of them for a period of time. He became intoxicated and began flashing large sums of money which everyone observed. There was evidence that he went to sleep inside the tavern and at closing time was escorted by the owner and several others to his truck which was parked outside and told that he could sleep in the truck until morning. The evidence indicated that he entered the truck and went to sleep on the pillow he kept for that purpose.

The persons who escorted him out returned to the tavern until it closed. Douglas Ridgeway testified that when the tavern closed he left with Terry Armstrong and intended to drive home with him. As they walked past Roane's truck they mention that he had quite a bit of money with him and one or the other suggested that they take his money while he was sleeping. Armstrong testified that although such a conversation did take place it was only in jest. For some reason, which is not explained by either of them, Armstrong got in Roane's truck with him. According to Armstrong, Roane became unruly and abusive and Armstrong struck Roane several times on the nose causing excessive bleeding. Armstrong left the truck for a moment but he returned to it. His explanation was that he wished to apologize to Roane for having struck him. There was some testimony that while the altercation between Armstrong and Roane was taking place, Roane had reached under the seat as if to remove a weapon and someone heard Armstrong tell him not to reach under it. Armstrong stated that Roane did reach under the

seat and he thought he had a gun and had told him not to do so.

Armstrong testified that before he got to the truck he saw Jake Morgan and Herschel Smith come out of the tavern together. Morgan grabbed Armstrong by the arm and told him to leave Roane alone because he was drunk and didn't need to be bothered. At that time Herschel Smith was at the truck door and Morgan was heard to say that Roane had a gun. Morgan ran in one direction and Armstrong and ridgeway ran back to their truck. As they were leaving Armstrong heard a shot. Smith, the deceased, had last been seen by the door of the truck. There was no indication of why Smith went to the truck or what he did after he was last seen standing by the open door.

Dudley Roane testified by deposition which was read to the jury. He was a resident of Clarksdale, Mississippi and on March 3rd he cashed a check for $500 intending to go to Mountain Home, Arkansas to seek employment. He placed some of the money in his billfold and about $400 in his boot. When he passed through Fair Oaks he stopped at the tavern because he was tired and thought a beer might pick him up. While he was there some other occupants asked him to join them and he bought a round of beer with money which he took out of his boot. He admitted drinking three bottles of beer but denied that he was intoxicated. He stated that he was then told that he had to leave because the tavern was closing and he went to sleep in his truck due to his fatigue. The next thing he recalled was being awakened roughly by someone coming into the truck and demanding money. He stated that the gave the man a $20 bill which infuriated him because he said he knew he had more money than that. He testified that this person was trying to pull him out of the truck and threatened to get the money and cut his throat with a knife. Roane stated, "He kept coming after me and that's when I fired the gun. He was just up inside the opened door of the truck. The person I shot at was the one that had been in the truck. I didn't see or shoot at any other particular person. As far as I knew I was trying to defend myself. I didn't know what else to do. I did not see another person." Roane testified that he saw a knife in the hand of his

assailant and that he had attempted to cut him on the throat with it. A knife was found on the ground beside the truck after the shooting which was delivered to the sheriff. The sheriff had been unable to determine the ownership of the knife and it had been misplaced in the sheriff's evidence room and could not be produced at the trial.

There were no eyewitnesses to the killing. Roane's testimony that he intentionally fired the pistol to repel what he believed to be an assault with a deadly weapon is undisputed. The intent to inflict injury can be inferred from the very character of the act. Any reasonable person would expect or intend serious injury to be inflicted by shooting another at point blank range with a .38 caliber pistol. Reasonable minds could not conclude otherwse.

The jury's finding that Roane did not intend either the shooting or the result could only be reached by disregarding the testimony of Roane in which he admitted that he fired the shot intentionally and intended to harm his assailant. As there were no facts or circumstances contradicting that testimony it was arbitrary for the jury to disregard it entirely. Our courts have said many times that the jury is the judge of the weight and credibility of the witnesses but it has no right to arbitrarily disregard the testimony of any witness which is consistent in its entirety and there are no facts or circumstances which contradict or conflict with it. *St. Louis-S.F. Ry. Co.* v. *Harmon,* 179 Ark. 248, 15 S.W.2d 310 (1929); *St. Louis-San Francisco Ry. Co.* v. *Williams,* 180 Ark. 413, 21 S.W.2d 611 (1929). While it is true that as a general rule the testimony of an interested witness does not stand as uncontradicted, the rule is not inflexible. Where the uncontradicted testimony of an interested witness is unaffected by conflicting inferences to be drawn from it and is not improbable, extraordinary or surprising in its nature or where there is no ground for hesitating to accept it as true there is no reason for denying the verity of that evidence. *Knighton* v. *International Paper Co.,* 246 Ark. 527, 438 S.W.2d 721 (1969); *McClarty Leasing Systems, Inc.* v. *Blackshear,* 11 Ark. App. 178, 668 S.W.2d 53 (1984).

All the witnesses admitted that they had not known

Roane before that night and that he had left the tavern and gone to sleep in his truck parked outside the tavern. Although Armstrong stated that his statement about "rolling the drunk" was in jest and he denied assaulting Roane with a knife, he did admit that for no apparent reason he entered the cab of Roane's truck. It was not disputed that Armstrong had hit him and caused his nose to bleed profusely and that Roane was mad about it. Nor was it disputed that, within minutes of that encounter, Smith, also for no apparent reason, entered the darkened truck. These facts do not give rise to conflicting inferences that Roane accidentally fired the weapon or that he intended to injure a person other than the one entering his truck at the time. On the contrary they would be entirely consistent with Roane's testimony. Roane's testimony is not extraordinary, improbable or surprising in nature. It is also to be noted that Roane's testimony is actually adverse to his own interest in this proceeding. It would establish every fact required to denude him of insurance coverage in the wrongful death claim. As there were no facts or circumstances contradicting Roane's testimony we conclude that the jury acted arbitrarily in totally disregarding it and the trial court erred in denying appellant's motion for judgment notwithstanding the verdict. The case is reversed and remanded with direction that the trial court enter an order not inconsistent with this opinion.

COOPER and MAYFIELD, JJ., dissent.

MELVIN MAYFIELD, Judge, dissenting. In this case as in *Talley* v. *MFA Mutual Ins. Co.*, 273 Ark. 269, 620 S.W.2d 260 (1981), the question is "whether a liability policy such as this one provides coverage for the unintended results of an intentional act." The answer there was that such coverage was provided. The policy here contains the same provision; therefore, it provides the same coverage.

*Talley* held that whether the results in that case were intended or not was a question of fact. In this case the insured testified that he intended to shoot the man who had attacked him but he actually shot another man. If that testimony is believed, the result of the intended act was

clearly unintended. In answer to an interrogatory, the jury found that the insured did not intend to shoot the man he actually shot. I cannot agree that this court should set that verdict aside.

The jury also found, by answer to an interrogatory, that the insurance company was not prejudiced by failure of the insured to give earlier notice of the occurrence or of the filing of this suit. I think that finding was supported by the evidence and I would affirm the judgment of the trial court entered upon the verdict of the jury.

COOPER, J., joins in this dissent.